DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ACADEMY FOR POSITIVE LEARNING, INC.,** a Florida not-for-profit corporation, **PALM BEACH MARITIME MUSEUM, INC.,** a Florida not-for-profit corporation, d/b/a **PALM BEACH MARITIME ACADEMY, MARLENY OLIVO,** an individual, and **PEDRO OLIVO,** an individual,
Appellants,

v.

**SCHOOL BOARD OF PALM BEACH COUNTY, FLORIDA** and **G-STAR SCHOOL OF THE ARTS, INC.,** a Florida not-for-profit corporation,
Appellees.

No. 4D19-2816

[February 24, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Glenn D. Kelley, Judge; L.T. Case No. 50-2019-CA-000405-XXXX-MB.

Shawn A. Arnold and Braxton A. Padgett of The Arnold Law Firm, LLC, Jacksonville, for appellants.

Jon L. Mills of Boies Schiller Flexner LLP, Miami, and Stuart A. Singer and Sabria A. McElroy of Boies Schiller Flexner LLP, Fort Lauderdale, for appellee, School Board of Palm Beach County.

### ***ON APPELLANTS' MOTION FOR REHEARING EN BANC AND CERTIFICATION OF QUESTION OF GREAT PUBLIC IMPORTANCE***

PER CURIAM.

After this court's 2-1 affirmance opinion issued April 22, 2020, appellants challenged the majority opinion by filing a motion for rehearing en banc and certification of question of great public importance under Florida Rules of Appellate Procedure 9.330 and 9.331, based on the following arguments, in pertinent part:

> Statewide there are more than 194,000 charter school students in nineteen other counties across all five appellate districts of the state where a voter-approved school board

operating millage is in place. Fla. H.R. Appr. Comm/Ways & Means Comm., HB 7123 (2019) Final Bill Analysis (May 28, 2019); Fla. Dept. of Educ., *Fla. Charter School Enrollment Share.* This Court's ruling will be precedent over matters in the Fourth District affecting 72,750 charter school students and parents (including over 21,000 in Palm Beach County) and millions of public dollars per year. *Id.* While House Bill 7123 (2019) amended section 1011.71(9), Florida Statutes, to codify the requirement that school boards share voted operating millage revenues with charter schools going forward, this legislative "fix" does not provide a remedy to Appellants because they were approved by voters prior to July 1, 2019.

Additionally, there are two lawsuits currently pending in the Eleventh Judicial Circuit of Florida related to a school board operating millage approved by voters in Miami-Dade County, from which charter schools have similarly been excluded. *City of Aventura v. Sch. Bd. of Miami-Dade Cnty.*, Case No. 2020-006112-CA-01 (Fla. 11th Cir. Ct. 2020); *Archimedean Academy, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, Case No. 2019-030739-CA-01 (Fla. 11th Cir. Ct. 2019). Other litigation is easy to foresee.

This decision will also likely have a major impact on future charter school funding cases. The majority's interpretation of the opening sentence of section 1002.33(17), Florida Statutes, erodes a guiding principle established by the Legislature that charter school students be funded the same as their counterparts attending district schools. . . .

Notably, the underfunded mandates of the School Safety Act apply to all public schools, including both charter schools and district schools alike. The exclusion of Palm Beach County's charter schools from the referendum has created a substantial disparity in funding between public charter schools and district schools. These charters now face a substantial hurdle in hiring qualified teachers to enable them to successfully compete with the other public schools in the district. § 1002.33(2)(c), Fla. Stat. (2019) ("Charter schools may fulfill the following purposes: . . . Provide rigorous competition within the public school district to stimulate continual improvement in all public schools."). Further, taxes

paid by parents for the safety of children should not favor the safety of school district children over public charter school children.

Given the far-reaching implications of the panel's decision on charter school students across the state, ongoing litigation involving the very same issue, and the varied conclusions of five reviewing judges in three separate suits, this case is exceptionally important and should be considered by this Court *en banc* under Fla. R. App. P. 9.331(d).

 . . . .

If this Court declines to rehear this case *en banc*, the Appellants alternatively request that this Court certify the following question as an issue of great public importance for review by the Supreme Court of Florida pursuant to Florida Rule of Appellate Procedure 9.330(a)(2)(C):

> Are local school boards required under section 1002.33(17), Florida Statutes, to share with public charter schools revenues generated from a voted operating millage levied pursuant to section 1011.71(9), Florida Statutes, which was approved by voters prior to July 1, 2019?

For the reasons argued above, we grant appellants' motion for rehearing en banc, withdraw this court's 2-1 affirmance opinion issued April 22, 2020, and substitute the following reversal opinion in its place. We also grant appellants' motion for certification of question of great public importance, although we certify a different question than that which appellants have requested, as shown at the end of the following opinion.

### *Opinion*

During the November 2018 election, the School Board of Palm Beach County, Florida placed a referendum on the ballot asking county voters to approve an ad valorem levy for the operational needs of only non-charter district schools. We conclude the 2018 referendum's exclusion of charter schools violated section 1002.33(17), Florida Statutes (2018), providing "[s]tudents enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the**

- 3 -

**same as** students enrolled in other public schools in the school district." (emphasis added).

Based on the foregoing, we reverse the circuit court's final judgment (and its incorporated "Orders on Pending Motions for Summary Judgment") and find that the 2018 referendum did not violate Florida law, as explained below. We remand for the circuit court to enter an order denying the school board's motion for summary judgment and granting appellants' motions for summary judgment, and to determine the proper remedy to which appellants are entitled under their complaint.

### The 2018 Referendum

The 2018 referendum appeared on the ballot as follows:

**REFERENDUM TO APPROVE AD VALOREM LEVY FOR SCHOOL SAFETY, TEACHERS AND OPERATIONAL NEEDS**

Shall the School Board of Palm Beach County have authority to levy 1.00 mills of ad valorem millage dedicated for operational needs of non-charter District schools to fund school safety equipment, hire additional school police and mental health professionals, fund arts, music, physical education, career and choice program teachers, and improve teacher pay beginning July 1, 2019 and automatically ending June 30, 2023, with oversight by the independent committee of citizens and experts?

\_\_\_\_\_Yes
\_\_\_\_\_No

Palm Beach County voters approved the 2018 referendum, which went into effect on July 1, 2019.

### The Underlying Litigation

After County voters approved the referendum, but before the referendum went into effect, two Palm Beach County charter schools and the parents of a student attending one of those charter schools (collectively, "appellants") filed a complaint for declaratory and injunctive relief against the school board. The complaint requested the circuit court to: (1) enter a declaratory judgment requiring the school board to share

- 4 -

the 2018 referendum revenues with charter schools on a pro rata basis; and (2) enjoin the school board from denying charter schools their proportionate share of the 2018 referendum revenues.  In the alternative, the complaint requested the circuit court to declare the 2018 referendum to be illegal and void.  Appellants asserted the 2018 referendum's exclusion of charter schools violated section 1002.33(17), Florida Statutes (2018), providing that "[s]tudents enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the same as** students enrolled in other public schools in the school district." (emphasis added).

Appellants and the school board filed cross-motions for summary judgment.  The parties agreed no factual issues existed and the case involved only statutory construction.  However, despite having initially pled an alternative request for relief asking the circuit court to declare the 2018 referendum to be illegal and void, appellants' motion for summary judgment primarily sought the entry of a declaratory judgment requiring the school board to share the 2018 referendum revenues with charter schools on a pro rata basis and enjoining the school board from denying charter schools their proportionate share of the 2018 referendum revenues.  As the circuit court later observed, "Neither side wants to lose the money, rather the parties simply disagree about who gets the money."

Following a hearing, the circuit court issued an order granting the school board's motion for summary judgment and denying appellants' motions.  The circuit court found the 2018 referendum did not violate Florida law.  The circuit court later entered a final judgment in the school board's favor, prompting this appeal.

We conclude the 2018 referendum's exclusion of charter schools violated Florida law, as explained below.

## A. *Interpreting sections 1002.33(17) and 1011.71(9) in harmony according to plain meaning favors the charter schools' position.*

The method by which students enrolled in charter schools are funded, and the sources from which such funding is derived, are provided in Section 1002.33(17), Florida Statutes (2018), titled "Charter schools." That section provides, in pertinent part:

> (17) Funding. -- **Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, <u>the same as</u>**

**students enrolled in other public schools in the school district**. . . .

 . . . .

(b)  **The basis for the agreement for funding students enrolled in a charter school shall be <u>the sum of</u>** the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds, discretionary lottery funds, **<u>and</u> funds from the school district's current operating discretionary millage levy**; divided by total funded weighted full-time equivalent students in the school district; multiplied by the weighted full-time equivalent students for the charter school. . . .

§ 1002.33(17)(b), Fla. Stat. (2018) (emphasis added).

Section 1011.71, Florida Statutes (2018), titled "District school tax," describes the sources from which "funds from the school district's operating discretionary millage levy" may be generated.  That section provides, in pertinent part:

(1)  . . . [E]ach district school board desiring to participate in the state allocation of funds for current operation as prescribed by s. 1011.62(19) shall levy . . . a millage rate not to exceed the amount certified by the commissioner as the minimum millage rate necessary to provide the district required local effort for the current year, pursuant to s. 1011.62(4)(a)1.  **In addition to the required local effort millage levy, each district school board <u>may levy</u> a nonvoted current operating discretionary millage**.  The Legislature shall prescribe annually in the appropriations act the maximum amount of millage a district may levy.

 . . . .

(9) In addition to the maximum millage levied under this section and the General Appropriations Act, **a school district <u>may levy</u>, by local referendum or in a general election, additional millage for school operational purposes up to an amount that, when combined with nonvoted millage levied under this section, does not exceed the 10-mill**

**limit established** in s. 9(b), Art. VII of the State Constitution. . . . Funds generated by such additional millage . . . must not be incorporated in the calculation of any hold-harmless or other component of the Florida Education Finance Program formula in any year. . . .

§ 1011.71(1), (9), Fla. Stat. (2018) (emphasis added).

Both sections 1011.71(1) and (9) use the words "may levy" to describe how a school district may increase its operating millage above the required operating millage also described in section 1011.71(1). That is, a school board "may levy" an increased operating millage by its own vote under section 1011.71(1), or a school board "may levy" an increased operating millage by voting to place an increased operating millage on the ballot and obtaining voter approval under section 1011.71(9). The consistent use of the words "may levy" makes both increased operating millages discretionary. *See Fla. Bar v. Trazenfeld*, 833 So. 2d 734, 738 (Fla. 2002) ("The word 'may' when given its ordinary meaning denotes a permissive term rather than the mandatory connotation of the word 'shall.'").

Because the increased operating millages permitted by sections 1011.71(1) and (9) are both discretionary, and because a school district's "current operating discretionary millage levy" is to be included in the method of funding students enrolled in a charter school under section 1002.33(17)(b), the 2018 referendum's exclusion of charter schools violated section 1002.33(17)'s requirement that "[s]tudents enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the same as** students enrolled in other public schools in the school district." (emphasis added). *See Bank of N.Y. Mellon v. Glenville*, 252 So. 3d 1120, 1127 (Fla. 2018) ("As with any matter involving an issue of statutory interpretation, courts must first look to the actual language of the statute and examine the statute's plain meaning.") (citation and internal quotation marks omitted); *Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Schs., Inc.*, 3 So. 3d 1220, 1234 (Fla. 2009) ("[W]e give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.") (citation and internal quotation marks omitted).

**B.** *The school board's arguments lack merit.*

*1. The school board misinterprets sections 1002.33(17) and 1011.71(9) as providing two distinct funding mechanisms. The sections are related and must be read in harmony.*

- 7 -

The school board argues sections 1002.33(17) and 1011.71(9) provide two distinct funding mechanisms and, therefore, section 1002.33(17) has no application to the instant case. According to the school board, "[g]eneral funding for charter schools under [section 1002.33(17)(b)] includes a mandatory requirement that [Florida Education Finance Program] funds be distributed to charter schools," but section 1011.71(9) explicitly states "additional millage for school operational purposes" generated after a local referendum or general election "do not become part of the calculation of the Florida Education Finance Program."

The flaw in the school board's reasoning is that charter schools' general funding under section 1002.33(17)(b) does not include *only* Florida Education Finance Program components. Rather, section 1002.33(17)(b)'s plain language provides charter schools' funding is "the sum of" three sources: (1) "the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds," (2) "discretionary lottery funds," and (3) "funds from the school district's current operating discretionary millage levy." That sum is then "divided by total funded weighted full-time equivalent students in the school district; multiplied by the weighted full-time equivalent students for the charter school." *Id.*

The flaw in the school board's reasoning arises from its misapplication of the word "including" within section 1002.33(17)(b). According to the school board, the word "including" modifies each funding component which follows – "gross state and local funds, discretionary lottery funds, and funds from the school district's current operating discretionary millage levy" – thus making each component a part of the Florida Education Finance Program formula.

However, if each funding component following the word "including" already was included in "the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act," what else is the fund for students enrolled in a charter school to be "the sum of"? The question cannot be answered, because interpreting the word "including" as modifying each funding component stated within section 1002.33(17)(b) improperly renders the phrase "the sum of" as mere surplusage. *See Sch. Bd. of Palm Beach Cnty.*, 3 So. 3d at 1233 ("Basic to our examination of statutes, and an important aspect of our analysis here, is the elementary principle of statutory construction that significance and effect must be given to every word,

phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage.") (citation and internal quotation marks omitted).

The only logical construction of section 1002.33(17)(b) is that the word "including" modifies only its nearest reasonable referent, that is, "gross state and local funds." *See Scherer v. Volusia Cnty. Dep't of Corrs.*, 171 So. 3d 135, 138 (Fla. 1st DCA 2015) ("The [nearest-reasonable-referent] canon holds simply that, whether coming before or after what is modified, modifiers (adjectives, adverbs, prepositional phrases, restrictive clauses) should be read as modifying *the nearest* noun, verb, or other sentence element to which they can reasonably be said to pertain.") (emphasis added).

Thus, the proper construction of section 1002.33(17)(b) is that the basis for the agreement for funding students enrolled in a charter school shall be *the sum of* "the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds," "discretionary lottery funds," and "funds from the school district's current operating discretionary millage levy."

As explained in Section A above, "funds from the school district's current operating discretionary millage levy" include increased operating millages permitted by both sections 1011.71(1) and (9).

### 2. *The school board overlooks section 1002.33(17)'s plain meaning that charter school students shall be funded by the same method as other public school students.*

The school board correctly argues that section 1002.33(17) describes the method of funding charter school students. However, the school board then argues the method of funding charter school students is not the same as the method for funding public school students, despite the plain meaning of section 1002.33(17)'s first sentence – "Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the same as** students enrolled in other public schools in the school district." (emphasis added).

The school board seeks to justify its disregard of the plain meaning of "the same as" by its own attempted application the nearest-reasonable-referent canon. According to the school board:

Applying this principle to the sentence at issue, it is clear that the modifier "the same as" must be read to modify the entire nearest **antecedent** phrase – "shall be funded as if they are in a basic program or a special program." Appellants simply ignore the words "as if they are in a basic program or a special program" between "funded" and "the same as." . . . It defies logic to interpret "the same as" to modify only the first few words in the antecedent clause but not the nearer, remaining words. It would also render the words "shall be funded as if they are in a basic program or a special program" meaningless, contrary to basic principles of statutory construction. It is an "elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage." *Mendenhall v. State*, 48 So. 3d 740, 749 (Fla. 2010).

(emphasis added).

The school board misapplies the nearest-reasonable-referent canon by considering only the "nearest *antecedent* phrase." (emphasis added). As our sister court explained, the nearest-reasonable-referent canon may rely on a modifier which "com[es] *before or after* what is modified." *See Scherer*, 171 So. 3d at 138 ("The [nearest-reasonable-referent] canon holds simply that, *whether coming before or after what is modified*, modifiers (adjectives, adverbs, prepositional phrases, restrictive clauses) should be read as modifying the nearest noun, verb, or other sentence element to which they can reasonably be said to pertain.") (emphasis added); *see also Antonin* Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012) ([T]he nearest-reasonable-reference canon "applies not just to words that precede the modifier, *but also to words that follow it*.") (emphasis added).

Applying the nearest-reasonable-referent canon to section 1002.33(17)'s first sentence, the modifier "the same as" may apply to the antecedent phrase "shall be funded as if they are in a basic program or a special program," *or* it may apply to the *subsequent* phrase "students enrolled in other public schools in the school district." The question is, to paraphrase our sister court, to which nearest sentence element can the modifier "the same as" reasonably be said to pertain? The most reasonable interpretation is that "the same as" modifies the *subsequent* phrase "students enrolled in other public schools in the district," because "the

- 10 -

same as" draws a direct comparison to the earlier phrase "[s]tudents enrolled in a charter school."

In reaching our opinion, we have not ignored the antecedent phrase "as if they are in a basic program or a special program" within section 1002.33(17)'s first sentence. On the contrary, we conclude the antecedent phrase "as if they are in a basic program or a special program" supports appellants' argument that charter school students are to be funded the same as other public school students. That is because "basic program" and "special program" are statutorily-defined terms which plainly apply to both charter school students and public school students.

Section 1011.61(6), Florida Statutes (2018), defines "Basic programs" as "includ[ing], but . . . not limited to, language arts, mathematics, art, music, physical education, science, and social studies."

Section 1003.01(10), Florida Statutes (2018), defines "Special program" as synonymous with "Alternative measures for students with special needs" and "mean[ing] measures designed to meet the special needs of a student that cannot be met by regular school curricula."

Section 1003.01(3)(a), Florida Statutes (2018), which defines "Exceptional student," elucidates what types of "special programs" exist:

> "Exceptional student" means any student who has been determined eligible for a **special program** in accordance with rules of the State Board of Education. The term includes students who are gifted and students with disabilities who have an intellectual disability; autism spectrum disorder; a speech impairment; a language impairment; an orthopedic impairment; an other health impairment; traumatic brain injury; a visual impairment; an emotional or behavioral disability; or a specific learning disability, including, but not limited to, dyslexia, dyscalculia, or developmental aphasia; students who are deaf or hard of hearing or dual sensory impaired; students who are hospitalized or homebound; children with developmental delays ages birth through 5 years, or children, ages birth through 2 years, with established conditions that are identified in State Board of Education rules pursuant to s. 1003.21(1)(e).

(emphasis added).

- 11 -

Based on the foregoing, we agree with appellants' argument that, under section 1002.33(17)'s plain meaning, "Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the same as** students enrolled in other public schools in the school district." (emphasis added).

### 3. *Contrary to both sides' arguments, the Legislature's 2019 amendment of section 1011.71(9) should not affect our interpretation of the 2018 version of section 1011.71(9).*

In 2019, the Legislature amended section 1011.71(9) to add the following language shown in bold:

> (9) In addition to the maximum millage levied under this section and the General Appropriations Act, a school district may levy, by local referendum or in a general election, additional millage for school operational purposes up to an amount that, when combined with nonvoted millage levied under this section, does not exceed the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. Any such levy shall be for a maximum of 4 years and shall be counted as part of the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. **For the purpose of distributing taxes collected pursuant to this subsection, the term "school operational purposes" includes charter schools sponsored by a school district**. Millage elections conducted under the authority granted pursuant to this section are subject to s. 1011.73. Funds generated by such additional millage do not become a part of the calculation of the Florida Education Finance Program total potential funds in 2001-2002 or any subsequent year and must not be incorporated in the calculation of any hold-harmless or other component of the Florida Education Finance Program formula in any year. If an increase in required local effort, when added to existing millage levied under the 10-mill limit, would result in a combined millage in excess of the 10-mill limit, any millage levied pursuant to this subsection shall be considered to be required local effort to the extent that the district millage would otherwise exceed the 10-mill limit. **Funds levied under this subsection shall be shared with charter schools based on each charter school's proportionate share of the district's total unweighted full-time equivalent student enrollment and used in a manner consistent with the**

- 12 -

**purposes of the levy**.  **The referendum must contain an explanation of the distribution methodology consistent with the requirements of this subsection.**

§ 1011.71(9), Fla. Stat. (2019) (emphasis added).

According to appellants, the 2019 Legislature's addition of the bolded sentences was meant to clarify the Legislature's intent for the 2018 referendum's approved millage increase under section 1011.71(9) "to be shared with public charter schools all along."  In support, appellants cite several Florida Supreme Court cases, including *Matthews v. State*, 760 So. 2d 1148 (Fla. 2000), to argue "a court may consider an amendment to a statute *soon after controversies as to the interpretation of the original act arise* as legislative interpretation of the original law.  Such subsequent amendments to a statute, *which serve to clarify* rather than change existing law, are entitled to substantial weight in construing the earlier law."  *Id.* at 1150 (citation omitted) (emphasis added).

Here, appellants argue, a growing controversy existed two years earlier about whether voted operating discretionary millage revenues must be shared with public charter schools.  *See Indian River Charter High Sch., Inc. v. Sch. Bd. of Indian River Cnty.*, Case No. 31-2016-CA-000432 (Fla. 19th Cir. Ct. June 13, 2017) (circuit court held the Indian River County School Board was required to share voted millage levy revenues with charter schools).  Thus, appellants argue, the Legislature's 2019 amendment to section 1011.71(9) was meant to clarify that "[i]t was the intent of the Legislature all along for Voted Millage funds to be shared with public charter  schools, even under the prior version of section 1011.71(9)."

On the other hand, the school board argues the 2019 Legislature's addition of the bolded sentences necessarily means those provisions did not exist within the 2018 version of section 1011.71(9).  In support, the school board cites *Arnold v. Shumpert*, 217 So. 2d 116, 119 (Fla. 1968) ("[W]hen a statute is amended, it is presumed that the Legislature intended it to have a meaning different from that accorded to it before the amendment.").  The school board also counters appellants' reliance on cases like *Matthews* with other Florida Supreme Court cases holding it is inappropriate to use an amendment enacted several years  after the original enactment to "clarify" original legislative intent.  *See, e.g., State Farm Mut. Auto Ins. Co. v. Laforet*, 658 So. 2d 55, 62 (Fla. 1995) ("[A] clarifying amendment to a statute that is enacted soon after controversies as to the interpretation of a statute arise may be considered as a legislative interpretation of the original law and not as a substantive change.  It would

- 13 -

be absurd, however, to consider legislation enacted more than ten years after the original act as a clarification of original intent[.]").

In our opinion, rather than attempting to choose one viable statutory construction canon over another in determining the 2019 amendment's effect on section 1011.71(9), we simply interpret the 2018 version of section 1011.71(9) as written. If we had been called upon to interpret the 2018 version of section 1011.71(9) before the 2019 amendment, we would have done so, using other statutory construction canons available for our consideration.

Also contrary to the parties' positions, the 2019 amendment's prior drafts or final bill analysis *should not* affect our interpretation of the 2018 version of section 1011.71(9). According to the school board, the Legislature considered in an earlier bill draft, but ultimately did not adopt, language which would have made the 2019 amendment retroactive. Instead, the Legislature included express language providing that the 2019 amendment applies prospectively, which the school board says shows the Legislature did not intend the changes to "clarify" a requirement that already applied. On the other hand, appellants argue the 2019 amendment's final bill analysis states it was intended "to *clarify* that the term 'school operational purposes' includes charter schools sponsored by a school district." (emphasis added).

The school board's reliance on earlier drafts, and appellants' reliance on a final bill analysis, are simply not persuasive as a matter of law. *See Rollins v. Pizzarelli*, 761 So. 2d 294, 299 (Fla. 2000) ("[W]hen the statutory language is clear, legislative history cannot be used to alter the plain meaning of the statute."); *Am. Home Assur. Co. v. Plaza Materials Corp.*, 908 So. 2d 360, 376 (Fla. 2005) (Cantero, J., concurring in part and dissenting in part) (proposing that "legislative staff analyses add nothing to an investigation of legislative intent").

### *Conclusion*

In sum, our review is limited to the 2018 versions of sections 1002.33(17) and 1011.71(9), and how those statutes may be read in harmony according to their plain meaning. The 2018 referendum, by excluding charter schools from that portion of the current discretionary operating millage levy provided in section 1011.71(9), violated section 1002.33(17)'s requirement that "[s]tudents enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic

program or a special program, **the same as** students enrolled in other public schools in the school district." (emphasis added).

Based on the foregoing, we reverse the circuit court's final judgment (and incorporated "Orders on Pending Motions for Summary Judgment") finding the 2018 referendum did not violate Florida law. We remand for the circuit court to enter an order denying the school board's motion for summary judgment and granting appellants' motions for summary judgment.

As for the remedy on remand, the school board and the appellants have agreed (in their requested supplemental briefing following our original opinion) that the "non-charter" limitation in the 2018 referendum is severable and may be stricken from the 2018 referendum. This is because the school board's resolution authorizing the 2018 referendum to be placed before voters included a severability clause:

> SECTION 8. SEVERABILITY. In the event that any word, phrase, clause, sentence, or paragraph of this Resolution shall be held invalid by any court of competent jurisdiction, such holding shall not affect any other work [sic], clause, phrase, sentence or paragraph.

We concur with the parties' agreement as to severability. "When a portion of a statute or ordinance is declared invalid the remaining portions thereof which are severable ordinarily should be recognized as valid, and it is the duty of the court to preserve their validity whether or not a severability clause was included." *Dade Cnty. v. Keyes*, 141 So. 2d 819, 821 (Fla. 3d DCA 1962). "The fact that the offending provision is not self-contained in a separate section of the statute does not prohibit the court from applying the severability rule." *Small v. Sun Oil Co.*, 222 So. 2d 196, 199 (Fla. 1969). Rather, "[t]he key is whether the overall legislative intent is still accomplished without the invalid provision." *Searcy, Denney, Scarola, Barnhart & Shipley v. State*, 209 So. 3d 1181, 1196 (Fla. 2017).

Applying those principles here, we sever and strike the "non-charter" limitation from the 2018 referendum, leaving the remainder of the 2018 referendum in full force and effect. Severing and striking the "non-charter" limitation from the 2018 referendum still accomplishes the 2018 referendum's intent to generate additional revenue "to fund school safety equipment, hire additional school police and mental health professionals, fund arts, music, physical education, career and choice program teachers,

- 15 -

and improve teacher pay." The only difference is that a portion of those funds must be shared with charter schools, for the reasons stated above.

The school board and the appellants nevertheless disagree on when the sharing of funds generated from the 2018 referendum must commence. The school board argues the charter schools are not retroactively entitled to referendum funds for the 2019-2020 and 2020-2021 school years because those funds have already been collected, obligated, distributed, and/or spent. Instead, the school board argues, the charter schools' remedy "must be on a going forward basis and the remainder of their claims should be remanded for further proceedings." According to the school board, "apportioning funds between charter schools and [non-charter] schools and ensuring compliance with the purposes contained in the 2018 Referendum will involve complex legal and factual questions that the trial court should address in the first instance."

On the other hand, the appellants argue that the charter schools "are entitled to receive their share of all revenues that have been collected since the 2018 Referendum went into effect, as well as to all revenues that will be collected during the remainder of the referendum period." According to the appellants, they "were seeking to enjoin the School Board and get a favorable declaratory judgment prior to the School Board collecting, distributing, and otherwise obligating the funds. During this appeal, with full knowledge that this Court could overturn the decision of the trial court, the School Board proceeded to spend the revenues from the 2018 Referendum. The School Board now attempts to use its knowing expenditure of these funds during litigation as a shield against liability for both the 2019-20 school year and the 2020-21 school year."

In reply, the school board argues its actions "in budgeting and spending the millage generated by the 2018 Referendum fall within the scope of governmental functions that are immune from money damages under the doctrine of sovereign immunity." According to the school board, "[t]o retroactively hold [it] liable for monetary damages for allocating millage pursuant to a voter-approved referendum that was previously upheld by two separate courts would significantly interfere with [its] control over public funds and school budgeting. Protecting the School Board from such interference, whether through a direct damages claim or supplemental declaratory relief, is precisely why sovereign immunity exists."

We conclude the issue of when the sharing of funds generated from the 2018 referendum must commence is not ripe for our review because the circuit court, based on its findings, did not reach this issue. We remand

for the circuit court to conduct any necessary hearings, evidentiary or otherwise, to determine this issue through findings of fact and conclusions of law in the first instance, subject to appellate review.

Lastly, to preserve the school board's ability to seek appellate review of this opinion, we certify to the Florida Supreme Court the following question of great public importance:

> Does a local referendum which levies additional millage for school operational purposes under section 1011.71, Florida Statutes (2018), but which includes only non-charter schools in the referendum, violate section 1002.33(17), Florida Statutes (2018) ("Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, the same as students enrolled in other public schools in the school district.")?

*Reversed and remanded for further proceedings consistent with this opinion; question of great public importance certified.*

LEVINE, C.J., DAMOORGIAN, CONNER, FORST, KLINGENSMITH, KUNTZ, and ARTAU, JJ., concur.
FORST, J., concurs specially with opinion.
KLINGENSMITH, J., concurs specially with opinion, in which CONNER and FORST, JJ., concur.
GROSS, J., dissents with opinion, in which WARNER and MAY, JJ., concur.
CIKLIN, J., dissents with opinion, in which WARNER, GROSS, and MAY, JJ., concur.
GERBER, J., recused after supplemental briefing.

FORST, J., concurring specially.

I concur with the majority opinion's determination that (1) this case merits en banc review and (2) the panel's decision should be withdrawn and replaced with an opinion reversing the trial court's order, finding that the arguments of appellants, not the school board, merit summary judgment.

As set forth in the majority opinion, a lawsuit was filed by two charter schools and the parents of a charter school student. Their complaint addresses the decision of the school board and the Palm Beach County voters to request, approve and provide additional *public school funding*, designated for important purposes such as school safety equipment; hiring

additional school police and mental health professionals; funding arts, music, physical education, career and choice program teachers; and improving teacher pay. However, Palm Beach County charter schools and their "over 21,000" students (per appellants' motion for rehearing en banc) would be excluded from this new funding, notwithstanding the fact that they are part of the Palm Beach County public school system.

The case was briefed and addressed by a three-judge panel of this court. That panel held for the school board, by a 2-1 vote, affirming the trial court's summary judgment order that rejected appellants' challenge to the 2018 referendum. A motion for rehearing en banc was filed, requesting that all twelve judges of the Fourth District Court of Appeal weigh in on this case, arguing that consideration by the full court in this "exceptionally important case" was necessary due to the "far-reaching implications of the panel's decision on charter school students across the state, ongoing litigation involving the very same issue, and the varied conclusions of five reviewing judges in three separate suits."

As Judge Tanenbaum noted in his concurring opinion in *State v. Petagine*, 290 So. 3d 1106 (Fla. 1st DCA 2020), "Florida's en banc rule" provides that "en banc consideration—if it is to be granted at all—certainly must be the exception and not the rule." *Petagine*, 290 So. 3d at 1111 (Tanenbaum, J., concurring in the denial of rehearing en banc). *See also* Fla. R. App. P. 9.331(a) (2020) (en banc review is warranted where "the case or issue is of exceptional importance or [where] necessary to maintain uniformity in the court's decisions"). As set forth below, this is such an exceptional case.

### The Issue here is One of "Exceptional Importance"

> We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal.

*Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954), *supplemented by* 349 U.S. 294 (1955).

The unanimous opinion in *Brown* did not signal the end of state-sanctioned deliberate segregation of public schools. It was merely the end of the beginning, as more litigation and court opinions followed. *See generally Brown v. Bd. of Educ. (Brown II)*, 349 U.S. 294 (1955), *supplementing* 347 U.S. 483 (1954). The Court's 1955 opinion in *Brown II* was deemed necessary to request desegregation of public schools "with all

deliberate speed." *Brown II*, 349 U.S. at 301. These decisions were met by various forms of opposition, most notably in Virginia, wherein the legislature adopted a strategy of "Massive Resistance." James H. Hershman Jr., *Massive Resistance*, Encyclopedia Virginia (June 29, 2011), https://www.encyclopediavirginia.org/massive_resistance. *See generally* Ira M. Lechner, *Massive Resistance: Virginia's Great Leap Backward*, 74 Va. Q. Rev. 631 (1998).

In 1959, one Virginia school board, in Prince Edward County, closed all of its public schools in opposition to desegregation and used state tuition grants to establish whites-only private schools. *The Closing of Prince Edward County's Schools*, Virginia Museum of History & Culture, https://www.virginiahistory.org/collections-and-resources/virginia-history-explorer/civil-rights-movement-virginia/closing-prince (last visited Oct. 19, 2020). "No provision was made for educating the county's black children." *Id.* This school board preferential treatment of one class of students (and their parents) over another continued in Prince Edward County until 1964, when the U.S. Supreme Court ruled that this scheme was a violation of "equal protection of the laws guaranteed by the Fourteenth Amendment." *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 225 (1964).

Appellants in the instant case have not claimed that the referendum at issue violated their Fourteenth Amendment Equal Protection rights. However, they have argued that:

> It has always been the intention for Florida's children to receive comparable levels of funding regardless of what public school they attend. Art. IX, § 1(a), Fla. Const. By opening section 1002.33(17) in the manner that it did, the Legislature created a baseline question to guide any interpretation of charter school funding provisions: Are public charter schools being funded at a comparable level to their district-operated counterparts? Any answer other than "yes" in this respect deserves the full scrutiny of the courts. In the instant case, the answer is "no." Palm Beach County public charter school students cannot be funded at a comparable level to other public school students in the District if they have been denied the benefit of the proceeds from the 2018 Referendum. To deny public charter school students *an equal opportunity* to a quality education is to deny the very intent of section 1002.33(17) and article IX, section 1(a) of the Florida Constitution.

(Emphasis added).

The Florida Constitution provides that "[t]he education of children is a *fundamental value* of the people of the State of Florida" and that it is "a *paramount duty of the state* to make adequate provision for the education of *all* children residing within its borders." Art. IX, § 1(a), Fla. Const. (emphasis added). Moreover, "[s]tudents enrolled in a charter school . . . **shall be funded . . . the same as students enrolled in other public schools in the school district**." § 1002.33(17), Fla. Stat. (2018) (emphasis added).

As many as 21,000 charter school students are directly impacted by the 2018 referendum which treats charter schools as both separate and unequal with respect to supplemental funding for important items *such as additional school security.* Although the situation in 2018-21 Palm Beach County is not in any measure on a par with that in Virginia in 1954-65, when segregation, discrimination and inequality were the norms and sanctioned by state and local authorities, the school board here seems to have taken a page from the "massive resistance" playbook in regard to full funding for charter schools and charter school students.

During several of this century's United States Supreme Court confirmation hearings, the concept of a "super precedent" has come up.[1] One legal academic has posited that "[t]o say a case is a super-precedent means it is judicially unshakeable, a precedential monument which may not be gainsaid, akin to having the statute-like force of vertical stare decisis horizontally." Michael Sinclair, *Precedent, Super-Precedent*, 14 Geo. Mason L. Rev. 363, 365 (2007). In a 2013 law journal article, then-law professor Amy Coney Barrett stated that *Brown* is one of seven cases "included on most hit lists of superprecedent." Amy Coney Barrett, *Precedent and Jurisprudential Disagreement*, 91 Tex. L. Rev. 1711, 1734–35 (2013).

---

[1] *See, e.g.*, Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States Before the H. Comm. on the Judiciary, 109th Cong. 145 (2005) (statement of Chairman Arlen Specter) (questioning Justice Roberts concerning whether he considered *Roe* a super precedent); Confirmation Hearing on the Nomination of Samuel A. Alito, Jr. to be an Associate Justice of the Supreme Court of the United States Before the H. Comm. on the Judiciary, 109th Cong. 321 (2006) (statement of Chairman Arlen Specter) (questioning Justice Alito concerning super precedent and *stare decisis*).

My determination that this case merits en banc review rests on the following factors: (1) the original two-judge majority's decision is in conflict with the principles of *Brown* and *Griffin,* a "super-precedent" and one of its progeny; (2) that 2-1 panel decision is at odds with the text of the Florida Constitution (establishing a "fundamental value" and "paramount duty") and a Florida statute's explicit prohibition; and (3) a significant number of individuals (the school children attending Palm Beach County charter schools, their parents, and the county's charter school administrators, staff and faculty) are negatively impacted by the underlying action of the school board, the referendum's passage, and the decision of the two-judge majority panel.

"Negatively impacted" may be an understatement—the school board and voters determined the additional monies were needed "to fund school safety equipment, hire additional school police and mental health professionals, fund arts, music, physical education, career and choice program teachers, and improve teacher pay." Endeavoring to ensure school safety is an important, if not fundamental, duty of the public school system, owed to *all* of its students and staff. Accordingly, this case may be deemed an "exceptional case," meriting en banc review.

As noted above, I agree with the majority opinion's analysis and determination. I want to emphasize that my decision to join the majority and sit en banc to address the panel's decision was not taken lightly. Reversal of a panel opinion by the full court should (and has been) a very limited occurrence. Several of my colleagues object to this court granting rehearing en banc and reversing the original panel decision, and I respect (though respectfully disagree with) their arguments, when stripped of the language discussed below.

## A Concern

Judge Gross's dissenting opinion, to the extent it addresses the merits of the parties' arguments, is comprehensive and well-reasoned (as is the majority opinion). I must note, however, that this dissenting opinion, joined by two of my other colleagues, begins with the exclamation that "[t]he majority has *fabricated* an invalid and unauthorized remedy by invoking the doctrine of severability, *hijacking the en banc process*, *ignoring* binding precedent, and acting not as a court of law bound by age-old legal precepts, but as *a political body governed by the principle of majority rule.*" Gross Dissenting Op. at *23 (emphasis added). That opinion also alleges that "[t]o resolve this political question here at issue, the majority has

resorted to an opaque, result-oriented analysis to shoehorn statutory language into the result it desires." *Id.* at *29.

The above-noted language characterizes the individual decisions of seven judicial colleagues to both (1) rehear this case en banc and (2) reverse a 2-1 panel opinion as borne out of a desire to act "as a political body governed by the principle of majority rule." Gross Dissenting Op. at *23. This dissent recklessly speculates that this could "negatively affect the public's perception of the judiciary's ability to render meaningful justice." *Id.* at *29. I am seriously concerned that this narrative may *itself* provide rhetorical talking points to those individuals and entities, proceeding from all points of the viewpoint spectrum, who are (and have been) willing to irresponsibly diminish the independence and legitimacy of the judiciary in furtherance of their agenda.

KLINGENSMITH, J., concurring specially.

I concur in the majority opinion but write to highlight a few facts either omitted or given cursory reference by my dissenting colleagues.

After the smoke clears and the dust settles, the fact remains that the parties themselves—and the School Board in particular—have advised this court that the "non-charter" limitation is severable from the referendum consistent with the School Board's Referendum Resolution adopted July 18, 2018 as follows:

> **SECTION 8. SEVERABILITY**. In the event that any word, phrase, clause, sentence, or paragraph of this Resolution shall be held invalid by any court of competent jurisdiction, such holding shall not affect any other work [sic], clause, phrase, sentence or paragraph.

It should also be noted that according to the record presented this court, the drafters of the referendum (again, the School Board) were well aware during the drafting stage of the potential illegality of the ballot proposal's exclusion of charter schools. "Charter schools are nonsectarian public schools that operate under a performance contract (charter) with a public sponsor—either a district school board or a university." *Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Schs., Inc.*, 3 So. 3d 1220, 1228 (Fla. 2009). One month prior to the adoption of the Resolution, on June 18, 2018, Palm Beach Maritime Academy, Inc., through its counsel, sent a letter putting the School Board on notice that the proposed 2018 Referendum was illegal in that it deprived public charter schools of their

right to share in the 2018 Referendum Revenues. Nonetheless, the School Board went forward despite those concerns and finalized the language of the referendum that was presented to the voters for approval, and now us for review.

I share the concerns raised by my dissenting colleagues about judges re-writing voter referendums, and acknowledge their condemnation of court-sanctioned voter disenfranchisement, *see, e.g., Jones v. DeSantis,* 462 F. Supp. 3d 1196 (N.D. Fla.), *rev'd en banc sub nom., Jones v. Governor of Fla.,* 975 F.3d 1016 (11th Cir. 2020). However, it should be emphasized that the drafters of the ballot language in question—the elected representatives overseeing the Palm Beach County School District—have expressly indicated to this court that it is, and was, their intention (through severability) that this court address any legal flaws inherent in the language, and to do so *without* striking down the entire referendum. This court is rarely presented with such a clear and unquestionable expression of a drafter's intent as we have in this case.

Therefore, if my dissenting colleagues are correct that the collective will of Palm Beach County voters is being upended by the result in this case, and that monies which the School Board wanted to keep from the charter schools will get allocated to them in the end, then it is not this court that is engaged in either "flying under false colors" or "hiding the ball." The School Board itself has invited this result by asking us to perform our judicial function under this stipulation. *See, e.g., United States v. Bogle,* 689 F. Supp. 1121, 1140 (S.D. Fla. 1988) ("Judicial power is by nature reactive and dependent upon the interests of litigants for presentation and illumination of the issues. The courts are not empowered to seek issues or promulgate advice." (internal citation omitted)). I am not so willing, as my dissenting colleagues may be, to casually cast aside the clear severability clause in the School Board's Resolution.

CONNER and FORST, JJ., concur.

GROSS, J., dissenting.

I dissent. The majority has fabricated an invalid and unauthorized remedy by invoking the doctrine of severability, hijacking the en banc process, ignoring binding precedent, and acting not as a court of law bound by age-old legal precepts, but as a political body governed by the principle of majority rule.

The statutory analysis in this case is lengthy and difficult, but the heart of the case is simple. Palm Beach County voters approved a referendum to tax themselves, with the proceeds going to "**non-charter** District schools." (Emphasis supplied). The referendum presented the voters with the following choice on the ballot:

**REFERENDUM TO APPROVE AD VALOREM LEVY FOR SCHOOL SAFETY, TEACHERS AND OPERATIONAL NEEDS**

Shall the School Board of Palm Beach County have authority to levy 1.00 mills of ad valorem millage dedicated for operational needs of non-charter District schools to fund school safety equipment, hire additional school police and mental health professionals, fund arts, music, physical education, career and choice program teachers, and improve teacher pay beginning July 1, 2019 and automatically ending June 30, 2023, with oversight by the independent committee of citizens and experts?

_____Yes
_____No

Finding the exclusion of charter schools from the referendum to be unlawful, the majority has wielded the doctrine of severability to sever the word "non-charter" from the referendum and hold that charter schools are entitled to share in the tax proceeds. This act of judicial hocus pocus disenfranchises the voters of Palm Beach County and violates section 1011.71(9), Florida Statutes, which requires voter approval for the tax to be valid.

### I. The Word "non-charter" Cannot Lawfully Be Severed From the Referendum So That Charter Schools Receive Part of the Tax Proceeds.

Section 1011.71(9), Florida Statutes (2018), requires voter approval "by local referendum or in a general election" to validate the tax levy at issue here. The 2018 referendum asked the voters to approve a tax "dedicated for operational needs of **non-charter** District schools." (Emphasis supplied). The majority holds that the exclusion of charter schools from the 2018 referendum was illegal and then severs the "non-charter" limitation from the referendum.

- 24 -

Contrary to the majority's conclusion, the non-charter language in the referendum is not severable.  To be sure, the Florida Supreme Court has held the doctrine of severability applies to citizen-initiated constitutional amendments.  *See Ray v. Mortham*, 742 So. 2d 1276, 1281 (Fla. 1999).  And our supreme court's reasoning in *Ray* would support applying a severability analysis to local referenda.

When a part of a law is declared illegal, the remainder of the law will be permitted to stand if:

(1)  the [invalid] provisions can be separated from the remaining valid provisions,

(2)  the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void,

(3)  the good and the bad features are not so inseparable in substance that it can be said that the Legislature [or in this case voters] would have passed the one without the other, and

(4)  an act complete in itself remains after the invalid provisions are stricken.

*Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 137 So. 2d 828, 830 (Fla. 1962) (formatting altered).

Here, the referendum fails prong (3) of the severability test.  The "non-charter" limitation was a material term of the referendum.  Nothing is more material in a taxing referendum than the identity of the recipients of the tax proceeds.  The voters never consented to a levy for the operational needs of charter schools.  Thus, the provision excluding charter schools from funding is so inseparable in substance from the remainder of the referendum that it cannot be said the voters would have passed the referendum without it.

To grant appellants the remedy they seek—obtaining a share of the proceeds of the referendum for charter schools—is akin to "hiding the ball" under *Armstrong v. Harris*, 773 So. 2d 7, 18 (Fla. 2000).  A "ballot must give the voter fair notice of the decision he must make."  *Askew v. Firestone*, 421 So. 2d 151, 155 (Fla. 1982).

The referendum identified the recipients of the proposed tax as non-charter schools. A later inclusion of charter schools as recipients of the tax monies would be a classic example of "flying under false colors" or "hiding the ball," conduct that would justify the invalidation of the referendum because it is impossible to say how the electorate would have voted "if the voting public had been given the whole truth." *Armstrong*, 773 So. 2d at 20 (quoting *Wadhams v. Bd. of Cnty. Comm'rs*, 567 So. 2d 414, 417 (Fla. 1990)).

In fact, in a voter information sheet distributed prior to the referendum, the School Board stated unequivocally that charter schools would not receive any portion of the funds generated by the levy.[2] Now, by stipulation, the School Board has gone back on its representation to the voters, agreeing that the "non-charter" limitation is severable. If this isn't hiding the ball, what is?

The severability clause in the School Board's resolution authorizing the referendum does not change the analysis. The referendum itself does not contain a severability clause. Thus, it cannot be said that the voters ever expressed a preference for severability.

The existence of a severability clause in a resolution authorizing a referendum is different from a severability clause within a statute. A severability clause within a statute is relevant because it expresses the Legislature's intent as to severability. In this case, by contrast, *the School Board's* intent as to the severability of any invalid portion of the resolution does not express the voters' intent. The key question is whether *the voters* expressed a preference for severability of any invalid portion of the referendum. They did not.

In short, the referendum's proceeds cannot be shared with the County's charter schools because the voters never approved a levy for the benefit of charter schools.

Section 1011.73 articulates the remedy for an illegal referendum: invalidation of the election. *See* § 1011.73(1), Fla. Stat. (2018) ("In the event any such election is invalidated by a court of competent jurisdiction, such invalidated election shall be considered not to have been held."); § 1011.73(2), Fla. Stat. (2018) (similar). Judge Gerber's original panel

---

[2] *See The School District of Palm Beach County's 2018 Tax Referendum FAQ*, https://www.palmbeachschools.org/UserFiles/Servers/Server_270532/File/TEN/Referendum%202018/!Ref2018_FAQ.pdf (last visited Jan. 21, 2021).

dissent recognized as much, given his proposed disposition to remand for the circuit court to invalidate the referendum. Consequently, even if the new en banc majority's interpretation of section 1002.33(17) were correct, the only legally-proper remedy would be to invalidate the 2018 referendum.

Rather than taking that principled approach and acknowledging the only proper remedy is the referendum's invalidation, the majority has instead rewritten the referendum and pulled a bait-and-switch upon the voters of Palm Beach County. By judicial fiat, the majority has imposed a levy for the benefit of charter schools that the voters never approved "by local referendum or in a general election" as required by section 1011.71(9).

## II. Because the Legislature Amended the Applicable Statute to Prevent Charter Schools from Being Omitted from a Similar Taxing Referendum, the Case or Issue is not of "Exceptional Importance."

Under Florida Rule of Appellate Procedure 9.331(a), "[e]n banc hearings and rehearings shall not be ordered unless the case or issue is of exceptional importance or unless necessary to maintain uniformity in the court's decisions." The original panel opinion did not conflict with any existing decision. It was a case of first impression. Thus, en banc consideration is only appropriate if the case or issue is of "exceptional importance."

This case involved the political question of whether a referendum to impose a discretionary millage for operational expenses under section 1011.71(9) had to include charter schools. The original panel held it did not. In 2019, our Legislature amended section 1011.71(9), Florida Statutes (2019), to require that charter schools be included in any future referendum. Therefore, the original panel opinion has limited application to other cases.

When an appellate court has taken up a case en banc as being of "exceptional importance" under rule 9.331(a), the case has involved a significant constitutional question or has broad application to many cases. *See, e.g.*, *Logue v. Book*, 297 So. 3d 605, 620 (Fla. 4th DCA 2020) (Gross, J., concurring specially) (finding First Amendment issue to be of exceptional importance); *In re Estate of Walker*, 609 So. 2d 623, 625 (Fla. 4th DCA 1992) (finding exceptional importance in a testamentary case interpreting the term "personal property" where the decision would have a

"far reaching effect"); *Stone v. State*, 547 So. 2d 158, 159 (Fla. 4th DCA 1989) (finding exceptional importance in a case interpreting the scope of searches incident to lawful arrest under the Fourth Amendment); *Ortiz v. State*, 24 So. 3d 596, 597 (Fla. 5th DCA 2009) (case which "fleshe[d] out the borders of both the 'feared medical emergency' exception to the warrant requirement . . . and the now well-recognized community caretaking function of police officers" found to be exceptionally important where original panel decision had "potentially far-reaching negative effects on the actions of law enforcement officers in fulfilling this function"); *In the Interest of D.J.S.*, 563 So. 2d 655, 657 (Fla. 1st DCA 1990) (finding exceptional importance where the case affected the rights of parents and children throughout the state and the interpretation of Chapter 39, Florida Statutes, as applied to termination of parental right proceedings).

When these situations are not present, and when the case does not otherwise affect the public's perception of the judiciary's ability to render justice, a case is not "enbancable." *See, e.g.*, *Fleischer v. Hi-Rise Homes, Inc.*, 536 So. 2d 1101, 1102 (Fla. 4th DCA 1988) (holding that an en banc decision was not necessary to correct impression from prior case that warranty deeds must contain express provisions for attorney's fees where offending language was not a matter of "exceptional importance" and was not necessary to maintain uniformity in court's decisions); *Univ. of Miami v. Wilson*, 948 So. 2d 774, 792 (Fla. 3d DCA 2006) (Shepherd, J., concurring in denial of rehearing en banc) (finding no exceptional importance in a wrongful death action where respondents' recovery would not affect the ability of other potential litigants to seek their own remedy nor influence the "public's perception of the judiciary's ability to render meaningful justice"); *Gainesville Coca-Cola v. Young*, 632 So. 2d 83, 84 (Fla. 1st DCA 1993) (finding a workers' compensation case was not of exceptional importance where the court's opinion did not have any impact upon the workers' compensation jurisprudence of the state).

"'Exceptional importance' surely does not mean any case in which the en banc majority disagrees with the reasoning or result of a panel majority." *State v. Georgoudiou*, 560 So. 2d 1241, 1247 (Fla. 5th DCA 1990) (Cowart, J., dissenting). Instead, "'[e]xceptional importance' must be interpreted to mean a case exceptionally important to the jurisprudence of the State as a judicial precedent." *Id.* at 1247–48.

This case does not involve a significant constitutional question and will not have broad application to other cases. The original majority holding has been nullified by the Legislature. The applicable statutes have been passed and amended by different Legislatures at different times over the

last 20 years.  As the Legislature did in 2019, the burden is on the Legislature to use statutory language that expresses its political will.

Moreover, the original majority decision will not have a meaningful impact on litigation outside the Fourth District.  While the original majority decision would initially have been binding on trial courts outside the Fourth District, *see Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992), any similar cases (e.g., the pending Miami lawsuit[3]) will inevitably be appealed to a different District Court of Appeal, which will then have de novo review of the statutory interpretation issue.  And the Florida Supreme Court would have jurisdiction to review any conflicting decisions among the District Courts of Appeal.[4]  Thus, because other District Courts of Appeal are not bound by this court's decision, the existence of similar litigation in other Districts does not transform the case or issue here into one of "exceptional importance."

The majority's decision to consider this case en banc, rather than allowing the original panel decision to stand, will also negatively affect the public's perception of the judiciary's ability to render meaningful justice.  To resolve this political question here at issue, the majority has resorted to an opaque, result-oriented analysis to shoehorn statutory language into the result it desires.

### III. *The majority rewrites section 1002.33(17), Florida Statutes (2018).*

---

[3] A circuit court in Miami recently decided *Archimedian Academy, Inc. v. School Board of Miami Dade County, Florida*, Case No. 2019-030739-CA-01 (Fla. 11th Cir. Ct. Dec. 9, 2020).  Unlike the referendum in this case, the Miami referendum did not expressly exclude charter schools from receiving funds generated by the levy.  *Id.* at 11.  Still, the Miami circuit court concluded that nothing in the plain language of Florida law, as it existed in 2018, required the School Board of Miami Dade County to provide a proportional share of the referendum levy funds to charter schools.  *Id.* at 19.  Reference to the circuit court's online docket reveals that a notice of appeal has been filed in that case.

[4] The majority's certification of a question of great public importance is curious.  In supplemental briefing, the parties *stipulated* that the doctrine of severability applied, subscribing to the principle that half a loaf is better than none.  Neither party has the incentive to seek review in the Florida Supreme Court where one possible outcome would be the invalidation of the entire referendum.  At the end of the day, no one, not even this court, is looking out for the voters.

Apart from the majority's improper decision to consider this case en banc, its interpretation of section 1002.33(17), Florida Statutes, is deeply flawed. By means of interpretive legerdemain, the majority has rewritten section 1002.33(17), Florida Statutes, while pretending not to do so. The majority's analysis, dressed in textualist garb, is a naked departure from textualism.

A. *The majority rewrites the first sentence of section 1002.33(17), Florida Statutes.*

The proper analysis must begin with the plain language of the statute. The first sentence of the statute provides: "Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, the same as students enrolled in other public schools in the school district." § 1002.33(17), Fla. Stat. (2018). Although subsection (17) is labeled "funding," it appears in the statute governing charter schools—it is not found in the part of the Florida Statutes governing funding for school districts. *See* §§ 1071.60–1071.78, Fla. Stat. (2018).

The first sentence of section 1002.33(17) consists of two parts: an operative clause and a comparative clause. *Id.* The operative clause of section 1002.33(17) states that "[s]tudents enrolled in a charter school . . . shall be funded as if they are in a basic program or a special program . . . ." *Id.* The operative clause is then followed by a comparative clause: "the same as students enrolled in other public schools in the school district." This comparative clause does not change the meaning of the operative clause, but instead expresses an equality. Specifically, the phrase "the same as" expresses an equivalence between the operative clause and the subsequent phrase within the comparative clause.

The natural reading of this statute, then, is that students enrolled in a charter school "shall be funded as if they are in a basic program or a special program," which is "the same as" how students enrolled in other public schools in the school district are funded. In other words, the first sentence of this funding provision describes a method of funding students based on the Florida Education Finance Program ("FEFP"), not an amount or source of funding. Thus, the statute sets forth a *method* for funding "students enrolled in a charter school," which is "the same as students enrolled in other public schools in the district."

The following example illustrates why this is the natural interpretation of the first sentence of section 1002.33(17). Consider a hypothetical

- 30 -

statute that says: "Law clerks shall be paid via direct deposit, the same as judges." No one would reasonably read this statute as saying that "law clerks shall be paid the same as judges." Such a statute is referring to a *method* of payment, not an amount or source of payment.

Here, the key question is whether the referendum violates the operative clause of section 1002.33(17)—i.e., the requirement that students enrolled in a charter school "shall be funded as if they are in a basic program or a special program." The referendum obviously does not violate this requirement. After the referendum, students enrolled in Palm Beach County charter schools are still "funded as if they are in a basic program or a special program." And this is "the same as students enrolled in other public schools in the school district." Dissatisfied with this result, however, the majority proceeds to legislate from the bench.

The majority accuses the School Board of misapplying the canon of the nearest-reasonable referent, but in fact it is the majority that has misapplied this canon. The canon "calls for a commonsense interpretation of the way in which words are put together to form phrases, clauses, or sentences." *Scherer v. Volusia Cnty. Dep't of Corr.*, 171 So. 3d 135, 138 (Fla. 1st DCA 2015). According to the majority, the most reasonable interpretation of section 1002.33(17) is that "the same as" modifies the subsequent phrase "students enrolled in other public schools in the district," rather than the antecedent phrase "shall be funded as if they are in a basic program or a special program." However, in applying the canon of the nearest-reasonable referent, the majority resorts to interpretive sleight-of-hand.

To reach its preferred conclusion, the majority sets up a false dilemma by claiming that "the modifier 'the same as' may apply to the antecedent phrase 'shall be funded as if they are in a basic program or a special program,' *or* may apply to the subsequent phrase 'students enrolled in other public schools in the school district.'" However, the modifier "the same as" is an expression of equivalence, and thus it necessarily refers to *both* the antecedent phrase and the subsequent phrase.

The question is not whether the phrase "the same as" refers to the subsequent phrase—it obviously does. Instead, the relevant question is whether, in referring to the antecedent phrase, the modifier "the same as" is referring to the *entire* antecedent phrase or only the word "funding." In other words, what is the nearest reasonable referent in the antecedent phrase? As the School Board correctly argues, the nearest reasonable referent is the *entire* antecedent phrase—"shall be funded as if they are in

a basic program or a special program."[5]  The School Board's use of the nearest-reasonable-referent canon is consistent with the "commonsense interpretation" of the statute.  By contrast, the majority's use of the nearest-reasonable-referent canon does considerable violence to the statute, resulting in anything but a "commonsense interpretation."

After misapplying the nearest-reasonable-referent canon, the majority then, as if using a Jedi mind trick, inexplicably asserts that it has not ignored the antecedent phrase "as if they are in a basic program or a special program."  The majority goes on to assert that, because "basic program" and "special program" are statutorily-defined terms that apply to all public school students, the antecedent phrase "as if they are in a basic program or a special program" actually supports the plaintiffs' argument.  But this is a *non sequitur* designed to distract the reader from the fact that the majority has simply excised a key phrase from the first sentence of section 1002.33(17).

B.  *The majority rewrites section 1002.33(17)(b), Florida Statutes.*

In addition to rewriting the first sentence of section 1002.33(17), the majority also rewrites section 1002.33(17)(b).

Again, we must begin with the plain language of the statute.  Section 1002.33(17)(b), Florida Statutes, states that the basis for funding students enrolled in a charter school shall be the sum of the school district's operating funds from the FEFP and the General Appropriations Act, and then provides examples of the types of funds included within the FEFP and the General Appropriations Act:

> (b) The basis for the agreement for funding students enrolled in a charter school shall be the sum of the school district's operating funds from the Florida Education Finance program as provided in s. 1011.62 and the General Appropriations Act, ***including* gross state and local funds, discretionary**

---

[5] The majority also argues that "'the same as' draws a direct comparison to the earlier phrase '[s]tudents enrolled in a charter school.'"  To the extent the majority is suggesting that the nearest reasonable referent in the antecedent phrase is "students enrolled in a charter school," this is incorrect.  The statute is not saying that "students enrolled in a charter school" are "the same as students enrolled in other public schools in the district."  Instead, the statute sets forth a *method* for funding "students enrolled in a charter school," which is "the same as students enrolled in other public schools in the district."

**lottery funds, and funds from the school district's current operating discretionary millage levy**; divided by total funded weighted full-time equivalent students in the school district; multiplied by the weighted full-time equivalent students for the charter school. . . .

§ 1002.33(17)(b), Fla. Stat. (2018) (emphasis added).

The majority interprets section 1002.33(17)(b) as meaning that the funding for charter schools is "the sum of" (which, as explained below, the majority takes to mean "the addition of") three different sources: (1) "the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds," (2) "discretionary lottery funds," and (3) "funds from the school district's current operating discretionary millage levy."

The majority's interpretation is a problem, however, because the statute does not contain this enumeration scheme. The majority has simply added these numbers to the statute in strategic locations to support its preferred interpretation. Had the Legislature intended the majority's interpretation, the Legislature could have included numbers before the phrases "the school district's operating funds," "discretionary lottery funds," and "funds from the school district's current operating discretionary millage levy." But the Legislature did not do so.

The majority also asks the following rhetorical question, claiming that it cannot be answered: "[I]f each funding component following the word 'including' already was included in 'the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act,' what else is the fund for students enrolled in a charter school to be 'the sum of'?" However, this question is based upon a flawed premise—namely, that "the sum of" as used in section 1002.33(17)(b) means "the addition of" rather than "the total amount of."

To be sure, this is one definition of the word "sum." *See Sum*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/sum (last visited September 15, 2020). But the word "sum" can also mean a "specified amount of money" or "the whole amount." *Id.* If the word "sum" is being used in section 1002.33(17)(b) to mean "a specified amount of money" or "the whole amount," then the School Board's interpretation of the statute does not render the phrase "the sum of" mere surplusage.

- 33 -

The question therefore becomes the following: which definition of "sum" is being used in section 1002.33(17)(b)?  "[G]ross state and local funds," "discretionary lottery funds," and "funds from the school district's current operating discretionary millage levy" are all types of funds included within the FEFP and the General Appropriations Act.  Therefore, the word "sum" in section 1002.33(17)(b) is not used to mean "the result of adding numbers," but rather is used to denote a "specified amount of money" or "the whole amount."

This interpretation is consistent with the natural reading of section 1002.33(17)(b), which is that each of the items listed after the word "including" are all illustrations of components of the FEFP.  It is completely unnatural to read the word "including" as applying only to the first item of the list.  Under the same natural reading of section 1002.33(17)(b), the referendum-based millage cannot be part of the "current operating discretionary millage levy" in section 1002.33(17)(b).

"Current operating discretionary millage levy" refers to the single levy contemplated under section 1011.71(1).  Notably, this phrase is used in section 1002.33(17)(b) and section 1011.71(1), but not in section 1011.71(9).  *Compare* § 1011.71(1), Fla. Stat. (2018) ("In addition to the required local effort millage levy, each district school board may levy a nonvoted current operating discretionary millage."), *with* § 1011.71(9), Fla. Stat. (2018) ("In addition to the maximum millage levied under this section and the General Appropriations Act, a school district may levy, by local referendum or in a general election, additional millage for school operational purposes up to an amount that, when combined with nonvoted millage levied under this section, does not exceed the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. . . . Funds generated by such additional millage do not become a part of the calculation of the Florida Education Finance Program total potential funds in 2001-2002 or any subsequent year.").

The fact that the Legislature did not use the term in section 1011.71(9) means that the "current operating discretionary millage levy" in section 1002.33(17)(b) does not include a separate "additional" millage levy authorized under a referendum, which is expressly excluded from FEFP funds.  *See* § 1011.71(9), Fla. Stat. (2018).

Had the Legislature intended the word "including" to modify only the phrase "gross state and local funds," the Legislature would have written the statute differently, such as by changing the order of the sentence, or

by using semicolons to separate the sentence into the three categories preferred by the majority. Unfortunately, the majority has taken it upon itself to rewrite the statute for the Legislature so that the statute now reads as follows, where new meaning is teased into the statute by the insertion of semicolons:

> (b) The basis for the agreement for funding students enrolled in a charter school shall be the sum of the school district's operating funds from the Florida Education Finance program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds[;] discretionary lottery funds[;] and funds from the school district's current operating discretionary millage levy; . . . .

§ 1002.33(17)(b), Fla. Stat. (2018) (alterations in brackets to reflect the majority's revisions).

### IV. *Prior to 2019, Section 1011.71(9) Allowed for a Voted-millage that Excluded Charter Schools.*

Appellants argue section 1011.71(9) must require any voted millage to include charter schools to be valid. They suggest the "express language of section 1011.71(9) specifically contemplates that the voted millage is combined with the nonvoted millage" and together make up a school district's total "current operating discretionary millage." In support of their position, appellants cite language in subsection (9) stating that "a school district may levy . . . additional millage for school operational purposes up to an amount that, **when combined with nonvoted millage** levied under this section, does not exceed the 10-mill limit . . . ." § 1011.71(9), Fla. Stat. (2018) (emphasis added).

However, the use of the word "combined" does not indicate that both the nonvoted millage and voted-upon millage together comprise the "current operating discretionary millage," as appellants suggest. Instead, the context of the sentence makes clear that the use of the word "combined" refers to the combination of the various millages for the purpose of assessing whether the combined rate complies with the overall constitutional limit on total assessed millage.

This conclusion is supported by the fact that the language of section 1002.33(17)(b) predates the additional voted-upon millage in section

- 35 -

1011.71(9).[6]  Therefore, at the time the funding provision of the charter school statute was adopted, its reference to the "current operating discretionary millage" could not have contemplated the voted-upon millage because that subsection did not exist.  That reference must have been solely to the nonvoted millage, now codified at section 1011.71(1).  As the circuit court observed, had the Legislature intended to include the additional voted-upon millage as part of charter school funding, it could have amended the charter school statute, but there was no amendment when the voted-upon millage provision was enacted.

In fact, the voted millage levied under section 1011.71(9) is expressly excluded from the FEFP calculation.  Because charter school funding is based on the FEFP, the millage levied pursuant to the 2018 Referendum in this case was not part of the "current operating discretionary millage" that must be shared with the charter schools.  The trial court properly concluded the Charter Schools were not entitled to a share of the revenues generated from the referendum on this basis.

## V.  *The 2019 Amendment to Section 1011.71 Changed the law; it did not Clarify the Law.*

There is no merit to appellants' argument that section 1011.71 should be viewed as a clarification amidst a "growing controversy about whether voted operating discretionary millage revenues must be shared with the public charter schools."  The Florida Supreme Court has adopted a policy of declining to rewrite legislation by viewing amendments as being "clarifications" of statutes enacted many years earlier.  *See, e.g., State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 62 (Fla. 1995) ("[A] clarifying amendment to a statute that is enacted soon after controversies as to the interpretation of a statute arise may be considered as a legislative interpretation of the original law and not as a substantive change.  It would be absurd, however, to consider legislation enacted more than ten years after the original act as a clarification of original intent."); *Parole Comm'n v. Cooper*, 701 So. 2d 543, 544–45 (Fla. 1997) ("[I]t is inappropriate to use an amendment enacted ten years after the original enactment to clarify original legislative intent.").

---

[6] The charter school statute was enacted in 1996 (previously section 228.056, Florida Statutes) and is now codified at section 1002.33, Florida Statutes.  The additional voted-upon millage was enacted in 2001 (previously section 236.25(6), Florida Statutes) and is now codified at section 1011.71(9), Florida Statutes.

Here, the pertinent provision regarding the voted-upon millage remained unchanged from the time of its enactment in 2001 until July 1, 2019. Under *Laforet* and *Cooper*, it is inappropriate to consider an amendment passed 18 years after the original enactment as a clarification of the original enactment.

There are two other reasons why the amendment was not a clarification. First, as the School Board notes, while the original version of the House Bill proposing the amendment to section 1011.71(9) included a section describing the proposed amendment as "amending and clarifying the use of certain voted discretionary operating millages," the final version of the bill did not include the term "clarifying." Fla. HB 7123, § 17 (2019). Appellants also rely upon a "Final Bill Analysis" published by the House of Representative's Ways & Means Committee, but that source is not persuasive because what ultimately prevails is the statute's actual language, not the wording that failed to survive the legislative process. *See GTC, Inc. v. Edgar*, 967 So. 2d 781, 789 n.4 (Fla. 2007) (noting that the Florida Supreme Court is "not unified in its view of the use of legislative staff analyses to determine legislative intent"); *Am. Home Assur. Co. v. Plaza Materials Corp.*, 908 So. 2d 360, 376 (Fla. 2005) (Cantero, J., concurring in part and dissenting in part) (proposing that "legislative staff analyses add nothing to an investigation of legislative intent").

Second, the Legislature ultimately did not adopt language which would have made the amendment retroactive. An earlier version of the bill proposing the amendment stated: "The provisions of this act relating to ss. 1011.71 and 1002.33, Florida Statutes, amending and clarifying the use of certain voted discretionary operating millages levied by school districts, **apply to revenues collected on or after July 1, 2019**." (Emphasis added). However, Chapter 2019-42, Laws of Florida, Section 17, deleted the word "clarifying" and creates a prospective application only. It states: "The provisions of this act relating to s. 1011.71, Florida Statutes, amending the use of certain voted discretionary operating millages levied by school districts, **apply to such levies authorized by a vote of the electors on or after July 1, 2019**." Ch. 2019-42 § 17, Laws of Fla. (emphasis added). It is clear from the context of the sentence that **all** provisions relating to section 1011.71, not just the portion pertaining to the limited use of the funds, apply prospectively.

The amendment was a change in the law, not a clarification.

### VI. Conclusion

Today, the majority has created an invalid remedy unsupported by existing law. To do so, it has employed rule 9.331's en banc process without the prerequisite to do so. *Saying* something is of exceptional importance is not the same as the case or issue *being* of exceptional importance.

Once having usurped the en banc rule, the majority says its decision derives from the "plain meaning" of the statute. Don't be fooled. What the majority has done is rewrite the operative clause of the first sentence of section 1002.33(17) to say that students enrolled in a charter school "shall be funded the same as students enrolled in other public schools in the school district."

And to bolster this rewriting of the first sentence, the majority has also rewritten section 1002.33(17)(b) so that charter school students shall be funded in the same amount and from the same sources as students enrolled in other public schools. But the statute doesn't say that.

Prior to 2019, section 1011.71(9) allowed for a voted-millage that excluded charter schools. That is no longer true as the Legislature has amended the statute prospectively.

In short, there is no basis to en banc this case. There is no authority for the majority's magically-crafted remedy. The trial court's decision should be affirmed.

And last, the majority's decision violates a principle long ago espoused by Alexander Hamilton, who wrote that "[t]he judiciary . . . may truly be said to have neither force nor will but merely judgment." The Federalist No. 78 (Alexander Hamilton) (capitalizations removed). The majority here has not exercised its judgment—it has exercised its will.

WARNER and MAY, JJ., concur.

CIKLIN, J., dissenting.

I respectfully dissent. The majority's unwillingness to place any express limitations on the trial judge upon remand is riddled with potential adverse consequences. At the very least, the majority should establish a firm guardrail instructing the trial court that under no circumstances is the trial judge permitted to raid the special referendum school fund established by taxpayers, paid for by taxpayers, and specifically restricted and earmarked by taxpayers. It troubles me that the majority has not shut

down that possibility—thereby giving the trial court carte blanche to ignore the voters of Palm Beach County by invading the taxpayer lock box they created.

The electorate clearly spoke to this issue 28 months ago in a free and fair election and yet my friends in the majority have decided to give an insouciant shrug to the prospect of court-sanctioned voter disenfranchisement. The School Board's framers of the ballot language may have made a mistake and were not permitted to restrict taxpayer funding for schools to only non-charter schools.[7] But voters of course, in good faith, did not know anything about the legalities involved when they voted on the ballot language that was presented to them. As far as voters and taxpayers were concerned, they were promised that those additional taxpayer funds, if the referendum passed, would be collected and "dedicated for operational needs of non-charter District schools."

---

[7] I am compelled to respond to the concurring opinion of my colleague, Judge Klingensmith, where it is stated:

> It should also be noted that according to the record presented [to] this court, the framers of the referendum (again, the School Board) were well aware during the drafting stage of the potential illegality associated with the ballot proposal excluding charter schools. . . . One month prior to the adoption of the Resolution, on June 18, 2018, Palm Beach Maritime Academy, Inc., through its counsel, sent a letter putting the School Board on notice that the proposed 2018 Referendum was illegal in that it deprived public charter schools of their right to share in the 2018 Referendum Revenues. Nonetheless, they went forward despite those concerns and finalized the language of the referendum that was presented to the voters for approval, and now us for review.

While the buck stops squarely with the Palm Beach County School Board, and while the Board has no choice but to claim full ownership of the final ballot language it placed on the November 2018 ballot, to dispel any "concerns" about "potential illegality associated with the ballot proposal," the Board obtained a detailed 11 page legal analysis and opinion from outside counsel before the Board "went forward . . . and finalized the language of the referendum." Presumably they went forward because their outside counsel assured them that the ballot language was legally sound. I do not play the role of School Board apologist but to the Board's credit, they were not flippant about the ballot language as my colleagues might suggest. *See* THE SCHOOL BOARD OF PALM BEACH COUNTY, FLORIDA, Agenda Item Details for July 18, 2018, https://go.boarddocs.com/fl/palmbeach/Board.nsf/goto?open&id=B25G6Y4259 FC (discussing and attaching legal opinion).

Over 72% of the electorate agreed to greater taxation for local education with the express, straightforward proviso that the money raised by additional taxation would only be used for public, "non-charter" schools.

I am somewhat alarmed that the majority easily "concurs" with, acknowledges, and accepts the School Board and charter schools' cavalier agreement to severability—thereby ignoring the will of 528,089 Palm Beach County voters who participated in a countywide election. Not this court nor the School Board nor the charter schools can legally agree to severing and striking the non-charter limitation from the 2018 referendum as if the sanctity of voter intent is of no concern and one that can be blithely cast aside as nothing more than an unimportant annoyance. The majority's assertion that "severing and striking the 'non-charter' limitation … still accomplishes the 2018 referendum's intent" is insulting to the 382,178 voters who voted yes on the ballot question, given the specific limitations of the referendum.

This encroachment on the sanctity of voter intent is not only misguided but dangerous as well and could conceivably produce indelible harm to the public's faith in free and fair elections—the centerpiece of our constitutional republic. To ignore the specific and unequivocal limitations placed upon the taxpayer funds generated by the referendum is an in-your-face affront and betrayal to the voters who participated in the 2018 referendum. To reiterate, neither the School Board nor the charter schools have legal authority to dismissively undo the will of the voters which was loudly declared by 72% of those participating in November of 2018. Neither the School Board nor the charter schools can now convert the assurances made on the 2018 ballot question to a subsequent mistruth rendering it a sucker punch to taxpayers by pulling a classic bait-and-switch on them.

Moreover, I believe we must contemplate the issue of equitable mootness. "An appeal is equitably moot when granting relief is possible, but inequitable. This concept reflects an unwillingness to alter the outcome, rather than an inability to do so." Katelyn Knight, *Equitable Mootness in Bankruptcy Appeals*, 49 Santa Clara L. Rev. 253, 262 (2009) (footnote omitted).[8] "Under this widely recognized and accepted doctrine, the courts have held that '[a]n appeal should . . . be dismissed as moot when, even though effective relief could conceivably be fashioned,

---

[8] "Equitable mootness" tends to arise in bankruptcy proceedings. *See, e.g., In re Cont'l Airlines*, 91 F.3d 553 (3d Cir. 1996). However, logic should lead us to the conclusion that the same analysis could easily apply to the situation at hand.

implementation of that relief would be inequitable.'" *In re Cont'l Airlines*, 91 F.3d 553, 558–59 (3d Cir. 1996) (alteration in original) (quoting *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993)).

Even if we assume that a remedy could possibly be fashioned, it is arguable that the time has long since passed to provide the type of extraordinary monetary relief requested by the charter schools. The referendum passed over two years ago, and the referendum millage has now been obligated through the 2020-2021 school year. At this late juncture, judicial approval of the appellants' assertion that their declaratory judgment claim entitles them to supplemental relief in the form of money damages to make up for prior annual School Board budgets might very well interfere with the School Board's sovereign budget and planning functions by requiring it to change or undo appropriations made years ago. Given the vast complexities associated with resource allocations and budgeting, including the coordinated distribution of funds, the negotiation of legal agreements, and the School Board's commitment to legal obligations, any remedy that could conceivably be fashioned might be impractical, if not impossible, to implement. Perhaps we should be reluctant to impose such relief, knowing it would place the School Board (or any sovereign authority) in the position of having to make dramatic public school programming alterations that were previously funded *and based upon* the increased revenues derived as a result of the passage of the referendum. To be sure, the charter schools who have sued the School Board will not suffer harm either way; in the event that a remedy is impossible, they simply will not receive the windfall financial benefit envisioned by the majority.

Above everything else however, my primary concern should be clear. Our duty has been and continues to be the sanctity of the voting process that took place in November 2018. Sovereignty resides in the voting public and this court should do everything in its power to minimize even the slightest chance of voter disenfranchisement. The 528,089 voters who showed up in the November 2018 election had a right to rely on the ballot language that was presented to them—rightly or wrongly—by the School Board. We should reject the notion of punishing voters for what now has become a School Board error by virtue of the new en banc majority vote. When the 3-judge panel opinion was released on April 22, 2020, there was no School Board error. In other words, both the School Board and the charter schools have "won" this case. My point being that this was and remains a fully debatable and justiciable issue of statutory construction and precisely why we should not permit the public will to be declared void. This right is exclusive to each individual voter and cannot be waived by

the trial court, the School Board, or the charter schools. As stated by the Second District Court of Appeal:

> So, consonant with the concept that the paramount right in and to elections rests in the people for whose ultimate benefit such elections are held in the first place, we are compelled to hold that when qualified electors responsibly and in good faith lay aside their every day affairs to execute [their civic duty as voters], they have the fundamental right to the confidence that their efforts will not thereafter be judicially rendered sterile absent fraud or other extraordinary circumstances which operate to deprive them of a full and efficacious vote.

*Nelson v. Robinson,* 301 So. 2d 508, 511 (Fla. 2d DCA 1974).

Rightly or wrongly, this is the pledge made by the School Board to its taxpaying constituents:



## COUNTYWIDE SCHOOL QUESTION

Shall the School Board of Palm Beach County have authority to levy 1.00 mills of ad valorem millage dedicated for operational needs of non-charter District schools to fund school safety equipment, hire additional school police and mental health professionals, fund arts, music, physical education, career and choice program teachers, and improve teacher pay beginning July 1, 2019 and automatically ending June 30, 2023, with oversight by the independent committee of citizens and experts?



### What is the need?

**Enhance school safety.** The District is committed to placing a certified law enforcement officer in every school. Funds from the approved mill will also be utilized to outfit Police Officers and Schools with the most up-to-date safety equipment.

**Hire additional school counselors and mental health professionals.** The community's children are growing up in rapidly changing and complex times.

Additional mental health counselors and school counselors will support the social and emotional development of students.

**Improve teacher pay.** By enhancing teacher pay through retention supplements, schools will be able to improve upon academic achievements and keep their best teachers.

**Keep arts and music education.** Continue to fund over 650 Art, Music, PE, Health, Choice and Career education teachers.

Ensure there are no cuts made to existing teaching staff levels.



### How will the money be spent?

- Continue to fund over 650 Art, Music, PE, Health, Choice and Career education teachers
- Add more School Police Officers and safety equipment
- Hire additional mental health professionals, school counselors, school social workers and school psychologists
- Maintain current teaching staff levels
- Improve teacher pay for experienced teachers



### Accountability to taxpayers

Every dollar collected and spent will be overseen by an independent Referendum Oversight Committee of citizens and experts.

If approved by voters, the levy would automatically expire after four years.





### How much will teachers receive?

Teachers will receive annual retention supplements based on their years of experience as follows:

- $1,000 Retention Supplement
  – Full-time teacher with 1 to 4 years of experience.
- $5,000 Retention Supplement
  – Full-time teacher with 5 to 9 years of experience.
- $10,000 Retention Supplement
  – Full-time teacher with 10 or more years of experience.

Unlike various State bonus programs, these Retention Supplements will count towards a teacher's Florida Retirement System (FRS) pension benefit and be paid out on a bi-weekly basis along with base salary.



### When is the election?

Voters will find the countywide ballot question on the November 6 ballot. To request a ballot by mail, call the Supervisor of Elections offices at (561) 656-6200.



### What about the lottery money?

Most of the Florida Lottery funds go to the Bright Futures Scholarships for graduating seniors and higher education. The District receives enough lottery money each year to fund just two days of operational expenses.



### Will Charter Schools receive any portion of this funding?

No. funds generated by the levy will be dedicated solely to traditional District-operated non-charter public schools.



## ELECTION DAY NOVEMBER 6



WWW.**StrongSchoolsPBC**.COM

For Information Only, Palm Beach County Schools

Ultimately, the parties may resolve this matter. Ultimately, the trial court may find a remedy that is appropriate under the circumstances. Ultimately, the School Board may decide to compensate the charter schools or be required to pay a money judgment. Indeed, the School Board may ultimately discover resources from which it can pay monies to the charter schools through charitable foundations, state grants, or federal grants. But, be that as it may, any public funds derived through the November 2018 referendum, are, by order of the voting public, hands-off for the trial judge and the charter schools. That is a plain, simple, and appropriate directive from the taxpaying, voting public whose will was expressed in November 2018 and which cannot be renounced.

As has been the unvarnished law of the state since 1888: "[I]t is a duty [of the courts] to enforce such expression[s] of the popular will where the elections have been free and fair, and the result thereof is clearly ascertained." *State ex rel Smith v. Burbridge,* 3 So. 869, 875-76 (Fla. 1888).

If mistakes were made by public officials, the electorate will have an opportunity to weigh in at the ballot box, if they choose. But, respectfully, this court should not leave open the possibility that the School Board and charter schools can craft a remedy that would permit the School Board or charter schools to erase the non-charter school-only proviso language of the referendum as if it never existed. This would be at best reductive and at worst a gross violation of the public trust. Such a downstream remedy would be outrightly deceptive because it would be contrary to the plain-spoken promises of the referendum ballot language, thus rendering it inequitable and in my opinion, fundamental error.

WARNER, GROSS, and MAY, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

- 43 -